IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 20, 2017

## TUT MAYAL TUT v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2012-C-1981     Cheryl A. Blackburn, Judge**

_____

### No. M2016-01673-CCA-R3-PC

_____

Petitioner, Tut Mayal Tut, appeals the denial of his petition for post-conviction relief from his guilty-pleaded convictions for two counts of especially aggravated kidnapping, two counts of especially aggravated robbery, and four counts of aggravated rape. Petitioner alleges that he received ineffective assistance of counsel during both the juvenile court transfer hearing and the criminal court plea proceedings. Upon our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Manuel B. Russ (on appeal) and Brian M. Griffith (at hearing), Nashville, Tennessee, for the appellant, Tut Mayal Tut.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Glenn R. Funk, District Attorney General; and Megan King, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

*Factual and Procedural Background*

On March 17, 2012, Petitioner and his codefendants, Yangreek Tut Wal, Duol Tut Wal, and Peterpal Tutlam, kidnapped, robbed, and brutalized the male victims, P.T. and

R.W.[1]  Petitioner was fifteen years old at the time.[2]  A delinquency petition was filed in the Davidson County Juvenile Court charging Petitioner with two counts of especially aggravated kidnapping, two counts of especially aggravated robbery, and four counts of aggravated rape.[3]  The Juvenile Court eventually transferred the case to the Davidson County Criminal Court.  Petitioner pled to the offenses as charged in exchange for a sentence of 30 years to be served at 100% in the Department of Correction and lifetime supervision as a sex offender.

According to the evidence presented by the State, the victims went to the *Tennessean* distribution center around 3:00 a.m. on March 17, 2012, to pick up newspapers to deliver.  Because the papers would not be ready for some time, the victims decided to go to R.W.'s apartment.  As they were walking up the stairs toward the apartment, the victims were approached by four individuals asking for the location of a specific apartment.  As the victims tried to give the men some directions, the men "charged at" the victims and hit them.  One of the assailants placed a knife at R.W.'s throat.  P.T. threw his coffee at one of the assailants.  The assailants continued to assault the victims and rummaged through their pockets, removing their wallets.  The victims were then forced into the back seat of a small car with one of the assailants while the other three sat in the front seat.  As the car was driven around, the victims were beaten and repeatedly stabbed with the assailants passing the knife back and forth among themselves.  The assailants demanded the PIN numbers for the victims' bank cards and withdrew money from ATMs.  The assailants then ordered the victims to perform fellatio on each other.  After approximately forty-five minutes to an hour of this ordeal, the assailants forced the victims to strip naked, exit the car, and get on the ground where they were again severely beaten.  As the assailants fled in the vehicle, they threatened to kill the victims.  The victims were able to walk to a nearby house to seek assistance and were eventually taken to the hospital.

---

[1] It is the policy of this Court to refer to victims of sexual assault by their initials in order to protect their privacy.

[2] Petitioner's codefendants were all adults at the time of the offenses.  This Court recently upheld Yangreek Wal's 40-year sentence imposed after he pled guilty to two counts of especially aggravated kidnapping and two counts of especially aggravated robbery.  *See State v. Yangreek Tut Wal*, No. M2016-01672-CCA-R3-CD, 2017 WL 2875925, at *1 (Tenn. Crim. App. July 6, 2017).  Duol Wal entered a guilty plea in exchange for a sentence of 30 years; he does not have an appeal currently pending before this Court.  Peterpal Tutlam was convicted at trial and received a total effective sentence of 150 years; his appeal is currently pending before this Court.  *See State v. Peterpal Tutlam*, No. M2016-01659-CCA-R3-CD.

[3] A separate petition was also filed charging Petitioner with unlawful use of drug paraphernalia and theft of property over $1000.  Those charges are not part of the present appeal.

During the investigation, the police were able to obtain security footage of one of the codefendant's withdrawing money from an ATM. A search warrant was obtained for Duol and Yangreek Wal's house.[4] There, the police found some of the victims' belongings as well as a "large amount of blood evidence" in the back seat of a car in the driveway. Petitioner's DNA was also discovered on some of the items. P.T. was able to identify Petitioner in a photographic lineup as the assailant at whom he had thrown his coffee.

On March 19, 2014, Petitioner filed a pro se petition for post-conviction relief. Counsel was appointed, and amended petitions were filed on August 29, 2014, and November 6, 2015. Petitioner alleged that he received ineffective assistance of both juvenile and trial counsel. Evidentiary hearings were held on August 26, 2015, November 10, 2015, and January 19, 2016. On July 13, 2016, the post-conviction court entered an order denying relief. The post-conviction court concluded that Petitioner failed to prove either deficient performance or prejudice with regard to both juvenile and trial counsel. Petitioner filed a timely notice of appeal.

*Analysis*

On appeal, Petitioner alleges that he received ineffective assistance of counsel during both the juvenile court transfer hearing and the criminal court plea proceedings. Specifically, Petitioner alleges that juvenile counsel was ineffective for failing to present proof at the transfer hearing that would have persuaded the juvenile court to deny the transfer to criminal court. Additionally, Petitioner alleges that trial counsel failed to convey accurate information concerning his bond, failed to provide all of the discovery material to Petitioner, and failed to accurately convey the length of Petitioner's plea-bargained sentence. Petitioner contends that but for these deficiencies of trial counsel, he would not have pled guilty but would have insisted on going to trial.

*I. Standard of Review*

Post-conviction relief is available for any conviction or sentence that is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. In order to prevail in a claim for post-conviction relief, a petitioner must prove his factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f); *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

---

[4] Duol and Yangreek Wal are brothers and are Petitioner's cousins.

On appeal, this Court will review the post-conviction court's findings of fact "under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise." *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d); *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). This Court will not re-weigh or re-evaluate the evidence presented or substitute our own inferences for those drawn by the post-conviction court. *Id.* at 456. Questions concerning witness credibility, the weight and value to be given to testimony, and the factual issues raised by the evidence are to be resolved by the post-conviction court. *Id.* However, the post-conviction court's conclusions of law and application of the law to the facts are reviewed under a purely de novo standard, with no presumption of correctness. *Id.* at 458.

## II. Ineffective Assistance of Counsel

Both the Sixth Amendment to the Constitution of the United States and article I, section 9 of the Tennessee Constitution guarantee the right of an accused to the effective assistance of counsel. *See Davidson v. State*, 453 S.W.3d 386, 392-93 (Tenn. 2014). In order to sustain a claim of ineffective assistance of counsel, a petitioner must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Under the two prong test established by *Strickland v. Washington*, 466 U.S. 668, 687 (1984), a petitioner must prove that counsel's performance was deficient and that the deficiency prejudiced the defense. *See State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel applied in federal cases also applies in Tennessee). Because a petitioner must establish both elements in order to prevail on a claim of ineffective assistance of counsel, "failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley*, 960 S.W.2d at 580. "Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 697).

The test for deficient performance is whether counsel's acts or omissions fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 688; *Henley*, 960 S.W.2d at 579. This Court must evaluate the questionable conduct from the attorney's perspective at the time, *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982), and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999). This Court will not use hindsight to second-guess a reasonable trial strategy, even if a different procedure or strategy might have produced a different result. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). However, this

deference to the tactical decisions of counsel is dependent upon a showing that the decisions were made after adequate preparation. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Even if a petitioner shows that counsel's representation was deficient, the petitioner must also satisfy the prejudice prong of the *Strickland* test in order to obtain relief. The question is "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). A petitioner must show that there is a reasonable probability "sufficient to undermine confidence in the outcome" that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Burns*, 6 S.W.3d at 463 (quoting *Strickland*, 466 U.S. at 694). In the context of a guilty plea, a petitioner "'must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" *Calvert v. State*, 342 S.W.3d 477, 486 (Tenn. 2011) (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)).

### A. Ineffective Assistance of Juvenile Counsel

The juvenile court has original jurisdiction over children who are alleged to be delinquent. *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *State v. Hale*, 833 S.W.2d 65, 66 (Tenn. 1992)). Tennessee Code Annotated section 37-1-134(a) provides the circumstances in which a juvenile court "shall" transfer a juvenile accused of conduct that constitutes a criminal offense to the criminal court to be tried as an adult. *See Howell*, 185 S.W.3d at 329. The juvenile must be at least sixteen years old of the time of the offense or, if younger than sixteen, be charged with certain enumerated offenses— including especially aggravated kidnapping, especially aggravated robbery, and aggravated rape—and be provided with notice and a hearing. T.C.A. § 37-1-134(a)(1)- (3). During the transfer hearing, the juvenile court must determine whether there are "reasonable grounds to believe"[5] that the juvenile committed the act alleged, that the juvenile is not committable to a mental health institution, and that the "interests of the community require that the child be put under legal restraint or discipline." T.C.A. § 37- 1-134(a)(4)(A)-(C); *see Mozella Newson v. State*, No. W2005-00477-CCA-R3-PC, 2006 WL 1896382, at *3 (Tenn. Crim. App. July 11, 2006) ("[A] transfer hearing involves three inquiries: (1) whether probable cause exists; (2) whether the juvenile is mentally disturbed; and (3) whether the juvenile is amenable to juvenile discipline."), *perm. app. denied* (Tenn. Dec. 18, 2006). In making its decision, the juvenile court should consider the nature and circumstances of the offense, the juvenile's prior delinquency record and response to past treatment efforts, and the availability of additional rehabilitative services. T.C.A. § 37-1-134(b). There is no interlocutory appeal of a juvenile court's

---

[5] The present version of the statute refers to this finding as "probable cause." *See* T.C.A. § 37-1-134(a)(4) (Supp. 2016).

decision to transfer a case to criminal court. T.C.A. § 37-1-159(d); *State v. Griffin*, 914 S.W.2d 564, 566 (Tenn. Crim. App. 1995). To preserve the issue, the juvenile must either proceed to trial and raise the issue on direct appeal after conviction or plead guilty and reserve the issue as a certified question of law; pleading guilty without reserving a certified question of law waives appellate review of the juvenile court's transfer decision. *Griffin*, 914 S.W.2d at 566-67. The juvenile has a constitutional and statutory right to the effective assistance of counsel during a transfer hearing. T.C.A. § 37-1-126(a)(1); *State v. Shawnda Lee James*, No. 01-A-01-9508-JV00339, 1995 WL 468433, at *4 (Tenn. Ct. App. Aug. 9, 1995); *see also In re Gault*, 387 U.S. 1, 41 (1967); *Howell*, 185 S.W.3d at 326.

In this case, the transfer hearing was held over the course of multiple days in May and June of 2012. In support of reasonable grounds to believe that Petitioner committed the acts alleged, the State presented the testimony of one of the victims, who described his ordeal in detail. Petitioner, through juvenile counsel, presented the testimony of Petitioner's neighbor, brother, uncle, and mother in an attempt to establish an alibi for the evening of March 16 and morning of March 17. During what is commonly referred to as the "best interest" portion of the transfer hearing, the State presented testimony regarding prior robberies committed by Petitioner and two cohorts in July of 2011, for which Petitioner was on juvenile court probation at the time of these offenses. The State also presented the testimony of Petitioner's juvenile court probation officer, Kelly Sullivan, now Kelly Hobbs. Ms. Hobbs testified that Petitioner was hanging around confirmed gang members. Ms. Hobbs had just met with Petitioner at his school and given him a sanction for staying at his uncle's house in Gallatin over the weekend without permission when she learned about the charges in this case. When the officers who arrested Petitioner searched him, they found some marijuana and drug paraphernalia in Petitioner's pocket; Petitioner denied that the items belonged to him, claiming that he was wearing his brother's pants. Juvenile counsel did not cross-examine Ms. Hobbs and did not present any additional proof. The juvenile court entered an order on July 11, 2012, transferring Petitioner's case to criminal court and setting a bond at $24,200.

At the post-conviction hearing, Petitioner testified that he was fifteen years old in July of 2012 when his case was transferred from juvenile court to criminal court. Petitioner had completed half of his freshman year in high school and spoke English as a second language at home. Petitioner was born in the United States, but his family had recently emigrated from southern Sudan. Petitioner's parents separated when he was in the fourth grade, and he had spent time living with each of them. Petitioner testified that he was doing well in school, but he also admitted that he had prior school disciplinary issues. Petitioner admitted that he was on juvenile court probation for the prior robbery charges at the time he was arrested on these charges, but he denied that he had ever violated his juvenile court probation.

Petitioner testified that juvenile counsel was appointed to represent him on these charges and had also represented him on his prior robbery charges in juvenile court. Petitioner testified that juvenile counsel met with him before each court date as well as three or four other occasions outside of court. Juvenile counsel explained the charges but did not explain the possible punishments. According to Petitioner, "our primary focus was on refuting the allegations against me," and they never discussed any mitigating evidence to present during the "best interest" phase. Juvenile counsel never obtained Petitioner's school records, discussed Petitioner's upbringing, or had Petitioner psychologically evaluated.

According to Petitioner, juvenile counsel met with the alibi witnesses for only a few minutes in court before he put them on the stand. Petitioner believed that their testimony was ill-prepared and that the time line they presented did not make sense. Petitioner testified that his family had previous interactions with the Department of Children's Services ("DCS"), but no one from DCS testified on his behalf at the transfer hearing. Petitioner never heard from juvenile counsel after the final transfer hearing date and never received a copy of the juvenile court's transfer order. Petitioner learned that his case had been transferred when the officers at the juvenile detention facility told him to "pack up [his] stuff, [he] was going to the justice center." Juvenile counsel never explained that Petitioner could appeal the juvenile court's transfer order.

On cross-examination, Petitioner denied having any psychological issues or receiving any mental health treatment. Petitioner acknowledged that juvenile counsel called the alibi witnesses that Petitioner suggested and that juvenile counsel had a private investigator working on the case. Petitioner also acknowledged that in addition to the prior robbery charges, he also had juvenile charges for disorderly conduct, resisting arrest, assault, and underage alcohol consumption. Petitioner testified that he had never been put on probation for those charges but would simply "get incarcerated for a few hours and get out." For the robbery charges, Petitioner's brother was transferred to criminal court, but Petitioner was placed on juvenile court probation. Petitioner had been on probation for a few months at the time of these offenses.

Juvenile counsel testified that he began practicing law in 1984 and that he had more recently focused his practice almost exclusively on juvenile court. Juvenile counsel had previously been appointed to represent Petitioner on his robbery charges in the fall of 2011. Prior to those charges, Petitioner had been placed on pretrial diversion in April of 2011 for domestic assault, disorderly conduct, and underage consumption of alcohol. During the dispositional hearing for Petitioner's earlier robbery charges, the juvenile court found that he had active community support, no disciplinary action at school, and was not using drugs or involved in a gang. However, before being arrested on these charges, Petitioner picked up a drug paraphernalia charge and a loitering during school hours charge. Petitioner's juvenile court probation officer was also going to file a

violation of his probation because Petitioner was using drugs and was "out of control." Juvenile counsel had asked the probation officer to work with him and hold off on filing the violation when Petitioner was arrested on the present charges.

Juvenile counsel met with Petitioner "maybe six times" while Petitioner was in custody on the present charges. During the first meeting, juvenile counsel discussed with Petitioner the process including the detention hearing, whether there would be a transfer hearing, and potential outcomes of the transfer hearing, as well as Petitioner's rights to an appeal. Juvenile counsel also discussed with Petitioner his family history and potential witnesses that could testify on his behalf. Given the facts of this case, juvenile counsel believed that the likelihood of Petitioner being transferred was very high. Juvenile counsel admitted that he had seen other serious felony charges that were not transferred to criminal court, but it was usually when the juvenile's involvement was minimal.

After juvenile counsel and Petitioner "had a lot of conversations about how bad these facts were and the fact that [the victims] said he was actively involved," they determined that an alibi defense would be the best strategy. As juvenile counsel explained, an alibi defense was Petitioner's "best option . . . [b]ecause if this was not dismissed, he was going to be transferred because of his involvement and how serious this stuff was." Juvenile counsel and his investigator spoke to Petitioner's alibi witnesses "to try to get the time line set," but when they actually testified, "things [were] a little different" and the time lines did not "mesh." Juvenile counsel testified that he "did the best [he] could with what [he] had."

As far as developing any mitigating evidence, juvenile counsel had a hard time finding witnesses that would testify favorably for Petitioner; "doors were shut at every avenue." After learning about what Petitioner was accused of, Petitioner's teachers "had nothing good to say," and a pastor who had previously testified on Petitioner's behalf at the robbery trial "want[ed] nothing to do with this." Juvenile counsel spoke to Petitioner's probation officer about potential treatment programs, but "she made it clear that given what happened, given the services that [Petitioner] had available to him at the time and his amenability to treatment, that she could not recommend any of those things." Even Petitioner's mother left the courtroom before she could be called to present mitigation evidence. Given the lack of favorable witnesses, juvenile counsel relied on the alibi defense and argument. After the juvenile court issued its order transferring Petitioner's case, juvenile counsel spoke to Petitioner on the phone and discussed the transfer order and the bond.

Petitioner presented the testimony of Mary Ann Hea, a licensed clinical social worker. Working pro bono, Ms. Hea gathered information on Petitioner's background that could have been presented during the "best interest" portion of the transfer hearing. According to Ms. Hea's conversations with Petitioner's family, even though Petitioner

was born in the United States, he was "very immersed in the Sudanese culture." Some of Petitioner's siblings were born in Africa and grew up severely impoverished. Petitioner's father had difficulty adapting to life in the United States and finding work. When Petitioner's mother began working, Petitioner's father "became very paranoid about her, jealous of her, started threatening to kill her all the time," eventually leading to their separation. Petitioner's father also had diabetes, a seizure disorder, and possibly Alzheimer's disease or dementia. Ms. Hea testified that Petitioner did not have a stable home life, and the children were often left unsupervised. Ms. Hea believed that if DCS had been aware of Petitioner's home situation, they would have at least investigated and possibly made some suggestions to improve it.

Ms. Hea testified that if she had been hired as a mitigation expert on Petitioner's case, she would have attempted to gather medical and school records. Ms. Hea testified that while Petitioner was incarcerated since entering his plea, he had completed his GED and enrolled in an electrical wiring class and a youthful offender class. Ms. Hea testified that this showed that Petitioner was "trying to rehabilitate or habilitate himself." She also would have sought a psychological evaluation to try to explain why Petitioner would act out so violently, especially given the sexual nature of the offenses. Ms. Hea testified that Petitioner's alcohol and marijuana use could have affected his developing brain. Ms. Hea compiled a report on Petitioner's social history that was entered as an exhibit.

On cross-examination, Ms. Hea agreed that this was "one of the most heinous criminal offenses" that she had ever encountered and that she had seen "cases far less serious be transferred." Ms. Hea admitted that she was not aware that Petitioner had gotten into trouble at school for assaults. While she was aware that Petitioner was on probation for robbery at the time of these offenses, Ms. Hea admitted that she was not aware of the underlying facts of that case.

Petitioner also presented the testimony of his juvenile court probation officer, Kelly Hobbs. Ms. Hobbs testified that Petitioner had been on probation for four months when he was arrested on the present charges. At the time Petitioner was placed on probation, Ms. Hobbs was a probation officer for mental health court. Ms. Hobbs explained that a juvenile would have to have a mental health diagnosis to be eligible for that program; however, Ms. Hobbs did not have a specific diagnosis for Petitioner noted in her records. Ms. Hobbs testified that juvenile counsel, who represented Petitioner on his robbery charges, would have been aware that Petitioner was in mental health court. Ms. Hobbs testified that prior to a transfer hearing, an attorney would usually request an evaluation of the juvenile to determine competency, insanity, and any other mental health issues. Ms. Hobbs did not see any such evaluation in Petitioner's file.

As to Petitioner's home life, Ms. Hobbs testified that Petitioner's mother worked late hours. Petitioner was often left unsupervised with four other teenaged males. Ms.

Hobbs also experienced a language barrier with Petitioner's mother which made it difficult for Petitioner to participate in a program that required family participation. Ms. Hobbs testified that Petitioner was home whenever she conducted random curfew checks and that she never found drugs in his home. Petitioner's grades in school were "pretty good," he met with a guidance counselor on a weekly basis, he did not have any attendance issues, and he otherwise "flew under the radar." However, the principal informed Ms. Hobbs that Petitioner was on a list because he had been observed "hanging around the wrong crowd." At the time Petitioner was arrested on these charges, Ms. Hobbs was about to issue a probation violation for Petitioner's missing curfew and going out of the county without her permission. When juvenile counsel spoke to Ms. Hobbs, she told him that she "might not be your best witness because [she would] have to tell them that [she] was about to violate [Petitioner]." Juvenile counsel did not call Ms. Hobbs to testify, though she did testify for the State.

The post-conviction court found that Petitioner did not establish clear and convincing evidence that but for the alleged deficiencies of juvenile counsel, the juvenile court would have retained jurisdiction of Petitioner's case. The post-conviction court found that prior attempts at rehabilitation had been unsuccessful, given Petitioner's "repeated engagement in escalating criminal behavior," including several write-ups at school for assault and his prior adjudications for robbery. The post-conviction court found that "Ms. Hea's credibility is undermined by her lack of knowledge of Petitioner's full juvenile and school disciplinary records." The post-conviction court found that there was no evidence that Petitioner suffered from or was diagnosed with a mental illness or that he was committable to an institution. The court found that juvenile counsel made a reasonable strategic decision to pursue an alibi defense to rebut probable cause, "the best defense for Petitioner from counsel's perspective." The post-conviction court concluded that "Petitioner has failed to show how any additional investigation, additional preparation, or other action by [juvenile] counsel would have resulted in the juvenile court's retaining jurisdiction over his case."

The evidence in this case does not preponderate against the post-conviction court's findings. Juvenile counsel made a reasonable strategic decision to focus on rebutting probable cause through the presentation of alibi witnesses given the dearth of favorable witnesses to present during the "best interest" portion of the transfer hearing. "'[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Felts v. State*, 354 S.W.3d 266, 277 (Tenn. 2011) (quoting *Strickland*, 466 U.S. at 690-91). The fact that juvenile counsel's strategy to attempt to have the case dismissed by presenting an alibi defense failed "does not, standing alone, establish unreasonable representation." *Goad*, 938 S.W.2d at 369. In fact, one of Petitioner's proposed witnesses, Ms. Hobbs, actually testified for the State

- 10 -

during the "best interest" phase, and she informed juvenile counsel that she would not be a favorable witness because she would have to tell the court that she was about to violate Petitioner's probation when he was arrested on these charges. During the post-conviction hearing, Ms. Hobbs testified that prior treatment efforts had been unsuccessful due to the language barrier with Petitioner's mother and that there was no program or services available to Petitioner based on the serious nature of this case. *See* T.C.A. § 37-1-134(b)(2), (5). Additionally, the proof was overwhelming that Petitioner was involved in these premeditated and aggressive offenses against the person. *See id.* at (b)(3), (4). Petitioner has not established that juvenile counsel's performance was deficient or that there was anything juvenile counsel failed to do that would have prevented his case from being transferred to criminal court. Petitioner is not entitled to relief.

## B. Ineffective Assistance of Trial Counsel

At the post-conviction hearing, Petitioner testified that trial counsel was appointed to represent him in criminal court, and Petitioner met with trial counsel four or five times as well as at each court appearance. Petitioner confirmed that he received discovery from trial counsel. However, according to Petitioner, trial counsel did not make available to him the video-recorded statements of his codefendants. Petitioner testified that trial counsel brought the recordings to the jail, but his computer malfunctioned. Despite his promise and Petitioner's requests, trial counsel never returned with the statements. Petitioner denied that trial counsel discussed with him possible defense strategies or reviewed the transfer hearing transcript.

Petitioner denied being advised that he could appeal the decision of the juvenile court to transfer his case. Petitioner denied that he understood he was waiving his right to appeal the transfer order when he entered his guilty plea because he did not know that such a right existed. Petitioner testified that he now understood how to appeal a juvenile court transfer order. Given that it was unlikely that the State would agree to a certified question, Petitioner asserted that he would have insisted on going to trial and risked a longer sentence in order to raise the issue on direct appeal.

Petitioner also denied knowing that he had a bond set by the juvenile court as part of its transfer order. According to Petitioner, trial counsel told him that his bond was "frozen." He found out that he "had a bond the whole time" several months later from a court officer. Petitioner testified that if he had known about his bond, "there's a possibility [he] could have tried to get someone to make it." Petitioner testified that being out on bond would have "affected [his] decision[-]making" because he could have met with trial counsel more often and discussed his case with other adults. Petitioner denied coming to court on the State's motion to increase his bond. Petitioner testified that his family could have made a small bond around $1000 or $2000.

- 11 -

Petitioner entered his guilty plea the Friday before trial. Petitioner testified that trial counsel presented the plea offer the day before and that it was the first plea offer from the State. Trial counsel advised Petitioner that if he took the offer, he would eventually get out; however, if he went to trial, he risked a much longer sentence. Petitioner was not given the opportunity to discuss the offer with his family. Even though Petitioner had previous experience in juvenile court, he had never dealt with anything that involved a jury trial and lengthy sentences. Petitioner had heard "a whole bunch of jail talk" that on a sentence being served at one hundred percent, "you can get good time . . . [that] would knock fifteen percent off the back of that sentence." Petitioner asked trial counsel whether the Department of Correction had "the power to grant you a pardon at seventy percent of whatever time that you have," and trial counsel agreed that it was "possible." According to Petitioner, he accepted the plea offer because he believed based on these conversations that he would "get[] out of prison in about seventeen years or so." Petitioner testified that if he had known he actually had to serve at least twenty-five years, he would not have accepted the offer and would have insisted on going to trial. During the plea hearing, Petitioner remembered the trial court stating that his sentence would be thirty years to serve at one hundred percent, but he "also remember[ed] what [trial counsel] said" with regard to the length of his sentence. Petitioner denied lying to the trial court when he agreed that he understood what his sentence would be. Petitioner did not recall telling the trial court that he was satisfied with trial counsel's performance.

Trial counsel testified that he had been licensed to practice law since 2005, that nearly all of his practice was dedicated to criminal defense, and that he had previously handled cases that had been transferred from juvenile court. Trial counsel was appointed to represent Petitioner when he was arraigned in criminal court. Trial counsel met with Petitioner at each court date and several times at the jail. Trial counsel discussed with Petitioner his charges, the range of punishment he was facing, lesser-included offenses, and the possible outcomes at trial. Trial counsel testified that he provided Petitioner with a copy of the discovery and reviewed with Petitioner the evidence in the case. Trial counsel discussed with Petitioner possible defenses and explained that certain evidence and defenses that Petitioner wanted to pursue could not be presented.

With regard to the recorded statements of the codefendants, trial counsel explained that he brought a computer to the jail to watch the recordings because people in jail are not allowed to have CDs. Trial counsel reviewed with Petitioner what the codefendants said prior to attempting to watch the recordings on his computer. However, there were problems with the audio on the computer. Trial counsel insisted that Petitioner was aware of the contents of the codefendants' statements. Trial counsel was able to review portions of Petitioner's transfer hearing with him.

Trial counsel testified that he had several discussions about bond with both Petitioner and his family. Petitioner's family called and said that they believed that his bond was $1000. Trial counsel responded, "if it's $1000, you better go make it quick." Trial counsel explained that the State's motion to increase bond that was "in the file" was never heard.

Trial counsel testified that the prosecutor originally stated that no plea offer would be made. Then, approximately one to two months before the scheduled trial date, the prosecutor made the offer for thirty years, but he would not agree to the inclusion of a certified question on the transfer issue. Trial counsel discussed this offer with Petitioner. At one point, the offer was withdrawn, and trial counsel "really started gearing up for trial." Then, on the Thursday before the scheduled trial date, the prosecutor reoffered the thirty-year deal. Trial counsel testified that every time one of his clients enters a plea, he reads the plea petition to the defendant "verbatim." Trial counsel and Petitioner discussed that Petitioner was giving up his right to an appeal, but trial counsel did not recall specifically discussing the right to appeal the transfer decision. Trial counsel believed that despite Petitioner's youth, he understood everything he discussed with trial counsel.

With regard to Petitioner's understanding of his sentence calculation, trial counsel believed it was a misunderstanding. Trial counsel explained to Petitioner that some of the lesser-included offenses would be eligible for "good time" but that the charged offenses were not eligible. However, trial counsel testified that he believed that Petitioner "understood that [his plea] was at one hundred percent." In fact, trial counsel remembered specifically discussing with Petitioner serving thirty years at one hundred percent because "we had the discussion about [Petitioner] will be quite a bit younger than I am right now when [Petitioner is] released."

The post-conviction court accredited the testimony of trial counsel that he reviewed all of the discovery with Petitioner, even the codefendants' statements despite the technical difficulties. The court found that trial counsel discussed with Petitioner the charges against him, the possible outcomes at trial, and the State's plea offer. The court found that both the plea petition and Petitioner's testimony at the plea hearing supported trial counsel's testimony that he advised Petitioner that the plea involved a sentence to be served at 100%. The post-conviction court concluded that Petitioner failed to prove either deficient performance or prejudice with regard to trial counsel.

Again, the evidence does not preponderate against the findings of the post-conviction court. Petitioner's signed plea petition and sworn testimony at the guilty plea hearing support trial counsel's testimony that he correctly informed Petitioner that his sentences were to be served at 100%. When a petitioner makes a solemn declaration in open court, it creates "a formidable barrier in any subsequent collateral proceeding"

- 13 -

because these declarations "carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). As to the codefendants' statements, trial counsel testified that he made Petitioner aware of the contents of the statements despite the technical difficulties with the actual recordings. Moreover, Petitioner has failed to establish any prejudice because he did not enter the statements into evidence during the post-conviction hearing and did not explain what part of the statements was unknown to him and why it would have altered his decision to plead guilty. As to the issue of bond, Petitioner has not shown how he was prejudiced by any alleged deficiency of trial counsel. Petitioner claimed that if released, he would have been able to discuss the case with his family. However, both trial counsel and juvenile counsel testified that they had several discussions about the case with both Petitioner and his family. Petitioner has not shown how any discussions outside of jail would have affected his decision to plead guilty or that the lack of such discussions rendered his plea unknowing or involuntary. Again, Petitioner has shown neither deficient performance nor prejudice with regard to trial counsel. Petitioner is not entitled to relief.

*Conclusion*

Based on the foregoing, we affirm the judgment of the post-conviction court.


_____
TIMOTHY L. EASTER, JUDGE